# STATE OF NORTH DAKOTA EX REL. PETER W. SKEFFING-TON, Relator, Appellant, v. DAN SEIGFRIED, Alexander Hay, L. B. McLain, Robert Kee, and C. J. Schmitt, as the Board of Trustees of the Soldiers' Home, and J. W. Carroll, as the Commandant of Said Home, and Ex-Officio Secretary of the Board of Trustees of the Soldiers' Home, Respondents.

(168 N. W. 62.)

**Grant — object of — comprehensive — object not fully attainable — grant may be used to accomplish real purpose — such right and power — not denied.**

1. The fact that the object of a grant may be comprehensive does not deny the right and the power, when that object cannot be fully accomplished, to so use the fund that its real and fundamental purpose may be attained.

**Statutes — spirit and reason of statute — general terms of — may be restricted — policy intended — must be construed in light of.**

2. The meaning of general terms and of the word "all" as used in § 1776 of the Compiled Laws of 1913 may be restrained by the spirit or reason of the statute, and every statute must be construed with reference to the policy intended to be accomplished.

**Soldiers' Home — object of its establishment — board of trustees — persons applying for admittance — rules and regulations — applicant financially able to support self — application refused — powers of trustees.**

3. Even though § 1776 of the Compiled Laws of 1913 provides that "the object of the Soldiers' Home shall be to provide a home and sustenance for all honorably discharged soldiers, sailors, and marines," etc., the board of trustees of the Soldiers' Home is fully justified in refusing admittance to one who owns 240 acres of land of the value of $12,000, a house and lot of the value of $2,000, and draws a pension of $30 a month, and where the proof shows that the home is overcrowded and the admission of the applicant would be to the detriment of poor and needy soldiers, their wives and widows.

**Board of trustees — rules and regulations — management and government — powers of board — may limit use of home — what cases — when.**

4. Under the express power granted by § 1781 of the Compiled Laws of 1913 to make rules and regulations "for the management and government" of the State Soldiers' Home, "including such rules as it shall deem necessary for the preservation of order, enforcing discipline, and preserving the health of the inmates," the board of trustees of such institution has the power to make rules in regard to the admission of the inmates which shall prevent an over-

crowding, and where there is not provision for or funds appropriated which are sufficient for the accommodation of all, to limit the use of the home to those who are most in need of its aid and support.

Opinion filed June 12, 1918.

Mandamus to compel admission to the Soldiers' Home.

Appeal from the District Court of Ransom County, Honorable *Frank P. Allen,* Judge.

Judgment for respondents.   Relator appeals.

Affirmed.

*Charles S. Ego,* for relator, appellant.

The relator here was denied admittance to the Soldiers' Home because he was possessed of more property and had a greater personal income than the rules and regulations prescribed by the board of trustees permitted.   The appellant contends that the statutes fix and determine the qualifications of applicants for admission to the Soldiers' Home, and that the board of trustees has no power to make rules changing the qualifications as defined by statute.   Comp. Laws 1913, §§ 1776, 1777.

The board of trustees is invested with the power of supervision and government of the home.   Comp. Laws 1913, § 1779.

The law confers upon such board the power to make rules for the management of the home, subject to the constitutions of the state and nation, for preserving order, health of the inmates, and enforcing discipline.   Comp. Laws 1913, § 1781.

"A more comprehensive word than 'all' cannot be found in the English language."   Moore v. Virginia Ins. Co. 26 Am. Rep. 373.

The context of the section of our statute here involved is plain.   The word "all" is used as an adjective signifying number, and includes all old soldiers of this class, *viz.,* all who have served in the Army of the United States, and who have been honorably discharged therefrom, and who are disabled by old age, disease, or wounds, and who have resided in this state one year.   Consequently, as used in the context, the word "all" denotes "each," "every," "any."   Burton v. Tuite (Mich.) 44 N. W. 282; Sherburne v. Sischo (Mass.) 9 N. E. 797; Swindell v. State (Ind.) 42 N. E. 528; Field v. Thistle (N. J. Eq.) 43 Atl. 1072; Campbell v. Cincinnati (Ohio) 31 N. E. 606.

"All" has a distributive as well as a collective meaning. Young v. DuBois, 113 N. Y. Supp. 456; Bellamy v. Bellamy, 6 Fla. 62; State v. Townley, 18 N. J. L. 311; Hare v. McIntire (Me.) 8 L.R.A. 451; Ford v. State, 42 Neb. 418, 60 N. W. 960; Ex parte Voll, 41 Cal. 29.

The language of the statutes is the embodiment of simplicity, and therefore the rule of contemporaneous construction does not apply. Such statutes must be interpreted judicially without reference to extrinsic facts. Wiles v. McIntosh County, 10 N. D. 594; Eddy v. Morgan (Ill.) 75 N. E. 916; Hord v. State (Ind.) 79 N. E. 916; Mantle v. Casey (Mont.) 78 Pac. 591; People v. Subway Co. (N. Y.) 79 N. E. 892; Studebaker v. Perry, 184 U. S. 258.

Laws cannot be amended or repealed by the courts under the plea that custom must be upheld. Travelers Ins. Co. v. Fricke (Wis.) 68 N. W. 120; Merritt v. Cameron, 137 U. S. 542; McCrary v. McFarland, 93 Ind. 466; Smyth v. Walton (Tex.) 24 S. W. 1084; Ewing v. Ainger (Mich.) 58 N. W. 767; Re Manhattan Sav. Inst. 82 N. Y. 142.

All legislative power is vested in the legislative assembly. Const. § 25; State ex rel. v. Budge, 14 N. D. 532; Vallely v. Park Comrs. 16 N. D. 25.

The attempt of respondent to make rules outside of statutory authority is legislative. The trustees do not possess such power, nor could it be delegated to them. The construction placed on the statutes by the trial court would render them unconstitutional. Re Watson (S. D.) 97 N. W. 463; Brookings v. Murphy (S. D.) 121 N. W. 793; Am. Dig. Cent. ed. title "Statutes" ¶ 303; Howell v. Sheldon (Neb.) 117 N. W. 109; Loser v. Board (Mich.) 52 N. W. 956.

*Kvello & Adams,* for respondents.

In construing a statute, consideration must be given to the object sought to be accomplished by the statute. The occasion and the necessity for the legislation must be kept in mind.

General words used in a statute must be understood as used in reference to the subject-matter in the mind of the legislature, and strictly limited to it. Comp. Laws 1913, § 1776; 36 Cyc. 1108–10–18.

Above all other considerations the object of this legislation was to provide a "home and subsistence for certain old soldiers. Can it be

said that the legislature had in mind or intended to make such provision for old soldiers who already had "home and subsistence?" State v. M'Kenny (Nev.) 2 Pac. 171, 173.

The word "all" as used by the statute simply refers to those old soldiers who do not have a "home and subsistence." It refers to every old soldier in such class or so situated. Glenn v. Wray (N.C.) 36 S. E. 167; Austin v. Berlin, 22 Pac. 433; Holden v. O'Brien, 90 N. W. 531; Dano v. Miss. R. Co. 27 Ark. 564; 2 C. J. 1134.

The board of trustees has the power to make rules and regulations not only for the management of the home in its general business details, and for the health, care, and comfort of the inmates, but also to fix and determine who of the old soldiers are eligible to admittance to the home for care and subsistence. Laws 1890, § 4, chap. 165; Ball v. Evans (Ia.) 68 N. W. 437; Howell v. Sheldon (Neb.) 117 N. W. 109; Brooks v. Hastings (Pa.) 43 Atl. 1075; 44 Am. Dig. "Statutes" § 296; 18 Decennial Statutes, Key No. 219; 36 Cyc. 1140.

BRUCE, Ch. J. This is an appeal from a judgment denying a peremptory writ of mandamus, which was entered after a demurrer to the answer had been overruled. This opinion is written after rehearing. The question involved is whether the board of trustees of the Soldiers' Home at Lisbon, North Dakota, must admit to the privileges of the home one who has adequate means of support and to the detriment of others who have not such means; or whether, on the other hand they may make reasonable rules and regulations, which shall prevent the home from being overcrowded, and where, on account of lack of room and facilities, admittance must be denied to some, they may favor those who are most in need. Incidentally there is involved the validity of a rule of the board which limits the use of the home "to veterans not having an annual income of over $400 from all sources, including pensions, rent of houses, farm interest, etc."

We are satisfied that the trial judge was justified in denying the writ of mandamus, and that the facts which are disclosed by the answer and the truth of which are admitted by the demurrer fully justify the trustees in denying the use of the home to the relator. We do not desire, however, to be understood as unquestionably approving the rule which has been adopted by them and which limits the use of the

home in all cases to those "not having an annual income of over $400 from all sources, etc."

Whether this rule would be justified or not would depend upon the circumstances and the demand for the accommodations furnished by the institution. We are satisfied, indeed, that the object of the legislature was to furnish a home for "*all* honorably discharged soldiers, sailors, and marines," their wives and widows, who might apply for its aid, and on account of old age or sickness desire its support and companionship or comfort, and this regardless of their financial situation.

We are equally satisfied that, although § 1776, Compiled Laws 1913, states that the object of the Soldiers' Home shall be to provide a home and sustenance for *all* honorably discharged soldiers, § 1781, Compiled Laws 1913, which places the general management and control of the institution in the hands of the board of trustees, with the power to make rules and regulations in relation thereto, gave to that board the power to make rules of admission as well as of government, and, when facilities were not at hand to accommodate all, to so manage the institution that those really in need should first be benefited. It is clear, indeed, that the alleviation of distress was the prime purpose of the gift, and it would be absurd to contend that, where two are equally entitled to a benefaction, he who has the right to determine which shall possess it cannot give it to the one most in need.

The Soldiers' Home at Lisbon was established by the legislature under the provisions of § 216 of article 19 of the Constitution of North Dakota, which provides among other things that:

Section 216. "The following named public institutions are hereby permanently located as hereinafter provided, each to have so much of the remaining grant of one hundred and seventy thousand (170,000) acres of land made by the United States for 'other educational and charitable institutions' as is allotted by law, *viz.:*

"First: A soldiers' home when located, or such other charitable institution as the legislative assembly may determine, at Lisbon, in the county of Ransom, with a grant of forty thousand (40,000) acres of land."

The 40,000 acres of land in question were part of the Federal grant,

which was made by § 17 of the Enabling Act, and which among other grants gave to the state of North Dakota:

"For the school of mines 40,000 acres; for the reform school 40,000 acres; for the deaf and dumb asylum 40,000 acres; . . . for the state normal schools 80,000 acres; for public buildings at the capital of said state 50,000 acres; and for such other educational and charitable purposes as the legislature of said state may determine 170,000 acres; in all 500,000 acres."

Under the sanction of the constitutional provision in question the Soldiers' Home was located at Lisbon, North Dakota, and by § 1776 of the Compiled Laws 1913, which originally appeared as chapter 165 of the Laws of 1890, it was provided that "the object of the Soldiers' Home shall be to provide a home and subsistence for all honorably discharged soldiers, sailors, and marines who have served in the Army or Navy of the United States, and who are disabled by disease, wounds, old age, or otherwise, and their wives and widows."

Section 1777 also provides that "no applicant shall be admitted to such home who has not been a resident of this state at least one year next preceding his application for admission therein, unless he served in a Dakota regiment or was accredited to the territory of Dakota."

By the same act the management of the Home was placed in the hands of a board of commissioners, and later, and by §§ 1778, 1779, and 1781 of the Compiled Laws of 1913, was placed in the hands of a board of trustees. These latter acts prescribe the power of the board of trustees and, among other powers, give to them the power to "make rules and regulations not inconsistent with the Constitution of the United States or of this state for the management and government of such homes, including such rules as it shall deem necessary for the preservation of order, enforcing discipline and preserving the health of its inmates."

It was under the provisions of the above act that the board refused admission to the plaintiff. Its reason for so doing is stated in the answer to the petition, and the facts therein pleaded are admitted by the demurrer.

This answer stated that the relator, although suffering with paralysis and confined to his bed and unable to care for himself, and having a wife who was advanced in years, physically frail and somewhat in-

firm, so that she could not properly care for him without impairing her health, was the owner of at least 480 acres of land in Ransom county, North Dakota, free of encumbrance, and of sixteen lots in Lisbon, on which he occupied a substantial and comfortable home, fitted with electric lights and other modern conveniences; that said lands were worth not less than $50 an acre; that said city lots, with the buildings thereon, were worth not less than $2,000; that the rents and profits of the relator's real estate were at least $500 a year; and that in addition thereto the relator drew a pension of $30 a month from the United States. Its answer further stated that the Soldiers' Home has only accommodations for about forty-five old soldiers, and hospital facilities for not to exceed nine, and that where old soldiers and their wives are admitted to the home the trustees are compelled to keep them in the hospital building, there being no other facilities; that the relator would have been a hospital case, and that to admit him would mean that indigent and destitute old soldiers, their wives, and widows, would be deprived of the home and sustenance provided for them by law, and of the care and attention which they so much need and which relator is abundantly able to and does provide for himself, in his own comfortable home surrounded by his wife and several sons and daughters,—all comfortably well to do. The answer further alleges and the demurrer admitted that there are not less than 1,000 old soldiers, their wives, and widows in the state of North Dakota qualified for admission to the Soldiers' Home, if relator is qualified, and that to admit relator and those similarly situated would result in the exclusion of indigent and destitute old soldiers, their wives, and widows, and that to avoid such a result, the rules and regulations herein before referred to were made and promulgated and for more than twenty-four years have been enforced and adhered to without question or dispute.

The contention of the relator centers around the word "all," which is to be found in § 1776 of the Compiled Laws of 1913, and which provides that "the object of the Soldiers' Home shall be to provide a home and subsistence for all honorably discharged soldiers, sailors, and marines, who have served in the Army or Navy of the United States, and who are disabled by disease, wounds, old age, or otherwise, and their wives and widows."

He maintains that the word "all" must be given its widest signifi-

cance. He also maintains that § 1781 merely provides that the board shall "make rules and regulations not inconsistent with the Constitution of the United States or of this state for the management and government of such homes, including such rules as it shall deem necessary for the preservation of order . . . and preserving the health of its inmates."

He maintains that this statute merely relates to the government of the home, and does not include or confer the power to make any rules or regulations on the question of admission or the right of admission, and that there is no other statute which confers this power.

We have, however, as we have before stated, no hesitancy in sustaining the judgment of the district court in the case which is before us, and this, in spite of the fact that the statute under consideration makes use of the word "all" and contains the statement that "the object of the Soldiers' Home shall be to provide a home and sustenance for *all* honorably discharged soldiers." The fact that the object of a grant may be comprehensive does not deny the right and the power, when that object cannot be fully attained, to so use the fund that its real and fundamental purpose can be best subserved. It is well established that "the meaning of general terms may be restrained by the spirit or reason of the statute, and that general language may be construed to admit implied exceptions," and that "every statute must be construed with reference to the policy intended to be accomplished by it." 36 Cyc. 1109, 1110; Hare v. McIntire, 82 Me. 240, 8 L.R.A. 451, 17 Am. St. Rep. 476, 19 Atl. 453; Ex parte Voll, 41 Cal. 29; Ford v. State, 42 Neb. 418, 60 N. W. 960; McCoy v. Fahrney, 182 Ill. 60, 55 N. E. 61; 2 Am. & Eng. Law, 143; Phillips v. State, 15 Ga. 518; Hallowell v. Gardiner, 1 Me. 93.

We are of the opinion that the words, "charitable purposes," which are used in the clause in § 17 of the Enabling Act, which granted to the state the land by which the institution is endowed for "such other educational and charitable purposes as the legislature may determine," must and should be construed in its broad, and not limited, meaning, and to include acts of public benefaction which are done for public purposes, as well as mere almsgiving or benefaction to the poor, and that as so construed the section authorizes the maintenance of an institution which shall care for all classes of aged and infirm

soldiers, irrespective of their monetary worth. See 5 R. C. L. 291; First M. E. Church v. Donnell, 110 Iowa, 5, 46 L.R.A. 858, 81 N. W. 171; 11 C. J. 299; New Castle Common v. Megginson, 1 Boyce (Del.) 361, 77 Atl. 565, Ann. Cas. 1914A, 1207; State ex rel. Linde v. Packard, 35 N. D. 298; L.R.A.1917B, 710, 160 N. W. 150.

We are also of the opinion that the legislature of North Dakota, when it enacted § 1776 of the Compiled Laws of 1913, intended that the Home should be open to "all old soldiers, sailors, and marines, who have served in the Army or Navy of the United States, and who are disabled by disease, wounds, old age, or otherwise, and their wives and widows."

This, however, must necessarily only have been to the extent of the capacity of the building, to the accommodations afforded, and within the limits of the funds provided.

We, in short, entertain no question as to the power of the board to adopt rules of admission as well as of government, and we believe that the power conferred by the statute (§ 1781) to "make rules and regulations not inconsistent with the Constitution of the United States, or of this state for the *management* and government of such homes, including such rules as it shall deem necessary for the preservation of order, enforcing discipline and preserving the health of its inmates," is sufficiently comprehensive for the purpose. Surely rules which shall prevent overcrowding relate to the government of the institution to the preservation of order, and the preservation of the health of its inmates, and surely a rule which prevents overcrowding by rejecting those who have other abundant means of support is not an arbitrary exercise of the power. It is to be remembered that for twenty years or more the control of the Home has been in the hands of a board of trustees made up entirely of old soldiers. And it would be unreasonable to suppose that such a board would not have at heart the best interests of all of their old comrades, or to suppose that they would not have a rational conception of the real purposes for which the Home was instituted.

It is also to be noticed that, although in the past and in many instances the statutes expressly gave to the several boards of trustees the power to make rules for the admission to the various state educational and charitable institutions, no such express power was given to the

40 N. D.—5.

trustees of the Normal Schools, the Agricultural College, the School of Forestry, the School for the Blind, and the State Industrial School. See §§ 1582, 1589, 1605, 1675, 1699, 1727. Nor is such a power expressly given under the new Board of Regents Act of 1913. It can hardly be believed, however, that it was the intention of the legislature that children of any age, or any degree of preliminary education, should be admitted to these institutions.

Of course, if the legislature definitely prescribes the standards of admission, no board of trustees may depart from its determination, but otherwise the board of trustees must be held to possess the usual powers, which would include the giving of aid where most needed.

Although counsel for appellant contends to the contrary, we are satisfied that the answer sufficiently pleads the fact that the accommodation of the plaintiff would result in denying the use of the Home to others more in need of its comfort and support.

The judgment of the District Court is affirmed.

Robinson, J. (specially concurring). The relator sues for a mandamus to compel the defendants to admit him as a member of the Soldiers' Home at Lisbon. He appeals from an order and judgment denying the suit. By answer, which is admitted, the defendants show that, according to the rules of the Home, no person can be admitted who has an income in excess of $400 a year; that in his application for admission to the Home the relator swore that his income did not exceed $400 a year, and the same is false and untrue; that he owns 400 acres of land in Ransom county, North Dakota, free of encumbrances and sixteen lots in Lisbon, on which he has a comfortable home, fitted with electric lights and modern conveniences, and in which he and his family reside; that the land is worth $50 an acre and the lots are worth $2,000. The rents of the land are at least $500 a year and the relator has a pension of $30 a month.

The Home is of limited capacity and the admission of the well to do would crowd out the needy veterans. However, it is the contention of counsel for relator that all disabled persons who have served in the Army and have been honorably discharged are entitled to the benefits of the Home, regardless of their wealth or the capacity of the Home. The statute reads thus:—

Section 1776. "The object of the Soldiers' Home shall be to provide a home and subsistence for all honorably discharged soldiers, sailors and marines who have served in the Army or Navy of the United States, and who are disabled by disease, wounds, old age or otherwise, and their wives and widows."

The object of the statute was as far as practicable to provide a home for *all* of a certain class who need a home, but not for *all* such as may apply regardless of their needs and the capacity of the home. Regardless of the word "all" or any other word in the statute, it must be given a construction in accord with reason and common sense.

The board of trustees in charge of the Home must of necessity have a right to control it, and to exercise some judgment and discretion in regard to the admission and discharge of inmates. In such cases an appeal to the court for a mandamus does not lie except to compel the performance of an act which the law specifically enjoins as a duty resulting from an office, trust, or station. Comp. Laws, § 8457.

Manifestly the law does not specifically enjoin the trustees of the Soldiers' Home to admit *all* applicants to the Home or to admit any person who is well able to help himself and who has no need of the Home.

GRACE, J. (dissenting). I cannot agree that the word "all" as used in § 1776 of the Compiled Laws of 1913 has the restrained meaning attached to it by my associates in the majority opinion. The word "all" in said section must be accorded its ordinary and usual significa-tion. The word "all" is defined by Webster's International Diction-ary as follows: "The whole number, quantity, or amount; the entire thing; everything included or concerned; the aggregate; the whole; totality; every thing or person." In State v. Maine C. R. Co. 66 Me. 510, the court said, defining the word "all:" " 'All' means everything, or the whole number of particulars,—the whole number."

Section 1776 declares the object of the Soldiers' Home shall be to provide a home and subsistence for *all* honorably discharged soldiers, sailors, and marines who have served in the Army or Navy of the United States, and who are disabled by disease, wounds, old age, or otherwise, and their wives and widows.

It is my opinion that any old soldier, sailor, or marine who has

served in the United States Army or Navy, and who has been honorably discharged, if he is disabled in the manner set forth in such statute, as a matter of strict legal right is entitled to be admitted to the Soldiers' Home if he wishes to be. The word "all" includes every such soldier within our state, and all that is needed to gain him admission to the Soldiers' Home is that he bring himself within the provisions of § 1776. His admission thereto does not depend upon whether he has or has not money or property, neither do I concede that the ministration of the state to the care and comfort of the soldiers is to be understood in the nature of a charity, nor is the maintaining of a home for the care, comfort, and protection of such old soldiers to be classed as a charitable institution. Rather is it the effort on behalf of the state to show its gratitude to the brave men who, when the life of the nation was imperiled, gallantly came to its defense, and offered to give up their life in the defense of their country, and in the defense of liberty. The state in such case is not conferring charity, but rather is it engaged in the payment of a debt of gratitude. 40,000 acres of land were granted to the state to maintain the Soldiers' Home, to which all soldiers qualified under § 1776 might retire if they desired, to spend their declining years when old age or sickness was upon them. I cannot bring myself to believe that the Soldiers' Home may be classed as a charitable institution, and I am confident that it is open to all and every one of the old soldiers in this state who come within the qualifications of § 1776. I am also further of the opinion that the board of trustees have nothing to do with the admission or exclusion of the old soldiers, and have no power to make any rules or regulations in regard to their admission or exclusion, but such qualifications for admission are those, and only those, which are contained in § 1776. The board of trustees have the power to make rules regulating to some extent the conduct of the old soldiers after their admission to the institution.